899 P.2d 133 (1995)
K.E., Appellant,
v.
J.W., Appellee.
No. S-6381.
Supreme Court of Alaska.
July 14, 1995.
*134 Mary-Ellen Zalewski, Anchorage, for appellant.
Allan Beiswenger, Robinson, Beiswenger & Ehrhardt, Soldotna, for appellee.
Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

OPINION
MATTHEWS, Justice.
Appellant K.E. argues that appellee J.W. should be equitably estopped from denying paternity of K.E.'s daughter L.E. J.W. was unable to father children at the time of L.E.'s birth. L.E. was conceived through natural insemination with the aid of a surrogate father.
J.W. and K.E. began a romantic relationship in 1987 or 1988. J.W. had undergone a vasectomy before the relationship began and was incapable of naturally fathering children. J.W. expressed a continuing desire to marry K.E. starting soon after the relationship began. Before meeting J.W., K.E. had a child, B.E., by a man to whom she was never married, B.S. K.E. wished to have another child and consequently was reluctant to marry J.W.
In March 1990, K.E. and J.W. discussed K.E.'s desire to have another child. They specifically discussed adoption, artificial insemination, vasectomy reversal, and the conception of the child through natural means by a surrogate father. K.E. decided that the least expensive and fastest option would be to have the child naturally fathered by B.S., B.E.'s father. While J.W. was hurt and distressed by K.E.'s plan, he did not feel that he had a right to stop her, as "it was her body" and they were not married.
K.E. had sexual intercourse with B.S. in Hawaii and became pregnant in June or July of 1990. After K.E. told J.W. that she was pregnant, they made plans to get married. K.E. and J.W. were married on August 25, 1990. The child, L.E., was born on March 19, 1991.
J.W. spent between 90 and 180 days with L.E. in the first two years of her life, as his occupation often took him away from the family. When they were together, J.W. acted as a father toward L.E., and they treated each other with love and affection. L.E. called J.W. "Papa."
J.W. and K.E. never represented to anyone that J.W. was L.E.'s natural father. J.W.'s and K.E.'s close associates know that J.W. is not L.E.'s natural father. K.E. planned to eventually tell L.E. who her natural father was.
J.W. and K.E. became separated in the first half of 1993. J.W. filed for divorce on June 4, 1993. K.E. filed a motion to establish a child support obligation in favor of L.E. on the part of J.W. In support of the motion, K.E. argued that (1) J.W. is equitably estopped from denying paternity because he represented to L.E. that he was her father, (2) J.W. expressly agreed to support L.E., and (3) J.W.'s consent to K.E.'s insemination by a surrogate gives rise to a duty of support. After a trial, the superior court made extensive findings of fact and ruled that J.W. has no child support duty toward L.E. K.E. appeals.
Equitable estoppel is the only theory which K.E. argues on appeal.[1] The elements of equitable estoppel are (1) representation of a position by conduct or word, (2) reasonable reliance thereon by another party, and (3) resulting prejudice. Jamison v. Consolidated Utilities, Inc., 576 P.2d 97, 102 (Alaska 1978).
Where it is argued that a putative father should be estopped from denying paternity based on representations made to the child, the representation and reliance elements of equitable estoppel are met if (1) the husband represented directly or implicitly to the child that he is the father, (2) the husband intended his representation to be accepted *135 and acted on by the child, (3) the child relied on the representation and treated the husband as a father and gave his love and affection to the husband, and (4) the child was ignorant of the true facts. Wright v. Black, 856 P.2d 477, 481 (Alaska 1993); H.P.A. v. S.C.A., 704 P.2d 205, 208 (Alaska 1985); Clevenger v. Clevenger, 189 Cal. App.2d 658, 11 Cal. Rptr. 707, 714 (Cal. App. 1961).[2]
The child can suffer prejudice as a result of relying on the husband's representations in any of the following three ways: (1) the child may be deprived of the mother's potential action to hold the natural father responsible for the support of the child; (2) the child may suffer serious and lasting emotional injury from the denial of paternity; or (3) the child may suffer a social injury from the removal of the status of legitimacy. See Wright, 856 P.2d at 481; Clevenger, 11 Cal. Rptr. at 714-15. In this case, none of these three forms of prejudice have been shown.
First, the husband's representation may deprive the child of a potential action to hold the natural father responsible for support by keeping the child's mother from attempting to find the natural father, see Clevenger, 11 Cal. Rptr. at 714, or by causing the mother to forego commencing an action against the natural father until after the applicable statute of limitations has expired. K.E. already knows that B.S. is L.E.'s natural father. The statute of limitations applicable to a potential paternity action by K.E. or L.E. against B.S. will not expire until three years after L.E. reaches the age of majority. See Hawaii Rev.Stat. § 584-6 (1992).
Second, in order for the child to suffer serious and lasting emotional injury from the denial of paternity, the husband's representations must continue long enough to truly establish the paternal relationship of the husband and the child. See Clevenger, 11 Cal. Rptr. at 717; In re Marriage of Johnson, 152 Cal. Rptr. 121, 123 n. 1 (Cal. App. 1979). In this case, J.W. spent only 90 to 180 days with L.E. after L.E. was born. J.W. filed for divorce from K.E. and stopped visiting L.E. when L.E. was only two years old. Under these circumstances the paternal relationship between J.W. and L.E. could not have been truly established.
Third, L.E. will not suffer a social injury from removal of the status of legitimacy. J.W. has not held L.E. out as his legitimate child. K.E.'s close associates are aware of the true circumstances surrounding L.E.'s conception. The status of legitimacy has not been removed because it never existed.
Since K.E. did not establish the prejudice element of her equitable estoppel claim, the judgment of the superior court is AFFIRMED.
NOTES
[1] K.E. also argues that several of the superior court's findings of fact are clearly erroneous. We do not need to address this contention because our disposition of this appeal would be the same regardless of whether we accept the challenged findings at face value or whether we accept K.E.'s characterization of the events and circumstances described in the challenged findings.
[2] In her brief on appeal K.E. does not argue estoppel based on representations made by J.W. to her prior to the conception of the child. Cf. L.M.S. v. S.L.S., 312 N.W.2d 853 (Wis.App. 1981) (husband prohibited from denying paternity where he had consented to wife's impregnation by a third party and agreed to treat the child as his). In her reply brief K.E. raises a policy argument based on the assertion that J.W. "did nothing to try and stop [K.E.] from proceeding with a plan on which she believed they both agreed." This argument is waived as it was not raised in K.E.'s opening brief. See Dewey v. Dewey, 886 P.2d 623, 628 n. 11 (Alaska 1994); Hitt v. J.B. Coghill, Inc., 641 P.2d 211, 213 n. 4 (Alaska 1982). Moreover, the trial court's findings are inconsistent with the imposition of a duty to object to K.E.'s impregnation by a third party on J.W. or an express or implied promise by J.W. that he would treat the resulting child as his. The court found:

14. This situation [K.E.'s plan to conceive a child with B.S.] hurt and distressed [J.W.] but he did not feel he had a right to stop her since "it was her body" and they were not married.
....
19. At no time prior to or after L.E.'s birth did the parties ever formalize an agreement, written, oral or otherwise regarding [J.W.'s] responsibilities to L.E. The parties never came to a "meeting of the minds."
....
31. [J.W.] never agreed, either expressly or by implication, that he would provide support for L.E. in the event of his divorce from [K.E.].
As these findings are not challenged on appeal and have evidentiary support, this estoppel argument would not succeed even if it were properly raised.